759 A.2d 764

**Darris Alaric WARE**

**v.**

**STATE of Maryland.**

**No. 96, Sept. Term, 1999.**

Court of Appeals of Maryland.

Sept. 14, 2000.

Motion for Reconsideration Denied Oct. 6, 2000.

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender and Daniel H. Weiss, Asst. Public Defender, on brief), Baltimore, for appellant.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

RAKER, Judge.

Appellant Darris Alaric Ware was tried by a jury from July 9 to July 22, 1999, in the Circuit Court for Anne Arundel County, and convicted of two counts of first degree murder and related handgun violations. This case is a direct appeal from a sentence of death.[1] *See* Maryland Code (1957, 1996 Repl.Vol., 1999 Supp.) Art. 27, § 414.[2] We find no errors that

---

1. In 1995, Appellant was convicted by a jury in the Circuit Court for Howard County of two counts of first degree murder for the murders of Bettina Krista Gentry (Kristi) and Cynthia Allen. The same jury sentenced Ware to death. This Court reversed the convictions and sentence upon direct review. *Ware v. State (Ware I )*, 348 Md. 19, 702 A.2d 699 (1997).

2. Unless noted otherwise, all subsequent statutory references shall be to Maryland Code (1957, 1996 Repl.Vol., 1999 Supp.) Art. 27.

tainted the proceedings. Accordingly, we affirm the convictions and the sentence of death.

## I.

Ware and Kristi Gentry[3] met and began dating in 1991. Their relationship became serious, and Ware moved into the house in Severn where Kristi lived with her mother, Nina Gentry, in August of 1993. In September of 1993, however, according to Nina Gentry's testimony, the relationship became strained, and Ware moved out.

On December 30, 1993, Nina Gentry returned home from work at midday and found Kristi, then 19, and her friend Cynthia Allen, 22, lying on the floor in the house. Each had been shot in the chest and at point-blank range in the head. Kristi was dead, and Cynthia died later in the hospital. Projectiles fired from a .380 caliber gun were found in the victims' bodies, and .380 caliber shell casings were found on the floor near the victims.

Most of the critical testimony in the case concerned events occurring the morning of the day of the murders, a few hours before Nina Gentry discovered the victims. At approximately 9:00 a.m., Kristi's friend Adrian Washington telephoned Kristi at the house. Adrian testified that Kristi sounded scared and that she abruptly hung up the phone twice. He then received a call from an angry male caller who quickly hung up; Ware's statement to the police indicated that Ware used caller ID to return Adrian's call, and told Adrian not to call the house again. Then, Adrian received a call from Kristi, during which he heard Kristi say, "Darris, I can't breathe. Get off me. You're hurting me."

---

3. In *Ware I*, we noted that Ms. Gentry was referred to throughout the record as "Kristi." The transcripts from the second trial consistently spell the name as "Christie." No explanation for the discrepancy appears in the record. For consistency, we adhere to the spelling we used originally.

When we have occasion to refer to several members of the same family, we shall use first names in order to distinguish them from one another.

After this call, Adrian immediately called his brother Thomas Washington, who in turn called the Gentrys' house. Thomas spoke to Ware, and the two argued. Thomas told Ware to stop what he was doing to Kristi, and Ware became angry. Ware asked Thomas whether he "was bulletproof" and threatened to "get [him] and [his] punk-ass brother."

After this conversation, at about 10:00 a.m., Thomas telephoned Kristi's brother Kevin Gentry at his place of employment in Laurel. Along with a co-worker, Kevin then drove to his mother's house, where he confronted Ware, beating him. Afterward, Kevin testified, Ware left the house, went to his car, retrieved a gun and pointed it at Kevin, threatening to kill him. Ware subsequently drove away. When Kevin also drove away to return to work, he came upon Ware returning to the house in his car; according to Kevin, Ware stopped and got out of the car and brandished a gun, as Kevin attempted to run Ware over with his car. Ware escaped harm. Kevin then returned to work in Laurel, arriving there before 12:00 noon.

Deborah Amrhein, a sales clerk at the On Target shooting range and sporting goods store in Severn, told police she saw Ware in the store at about lunch time on December 30. A store manager testified that one box of .380 caliber ammunition of the type and make used by the killer was sold on December 30 at about 12:10 p.m. Neighbors of the Gentrys testified that they saw Appellant arrive back at the house between 12:00 and 12:30 p.m. In his statement to the police, Ware admitted that he owned a .380 caliber handgun. The murder weapon was never found.

At about 12:00 noon, Edward Anderson, an inmate at the Maryland House of Corrections Annex in Jessup and a friend of Kristi, telephoned the house. He spoke to Cynthia, who told him that Ware was in the house and that Kristi and Ware were arguing. Anderson heard Kristi screaming. Then, Anderson heard three gunshots, followed by silence and the sound of someone hanging up the phone. Prison records indicated that this call terminated at 12:31 p.m. Anderson then called neighbors of the Gentrys and asked them to check on

the house; neighbor Clyburn Cunningham, Jr. went to the house and rang the doorbell. There was no answer.

Nina Gentry had spoken to Kevin Gentry earlier in the morning when he came, upset, to see her at her workplace, after his encounter with Ware. Some time after noon, she decided to leave work and go to the house. After finding the victims, she called 911. Paramedics and police came to the house. While the police were in the house, Ware called, identified himself, and spoke to police officers. Ware asked if Kristi was there. A police officer asked Ware to come to the house; the officer then departed to look for Ware at an address where he was believed to live. The officer encountered Ware a short distance away, driving toward the house, and arrested him. We will supply additional facts as necessary in discussing the several issues.

Following this Court's reversal of Ware's convictions, he was retried before a jury in the Circuit Court for Anne Arundel County on July 9 to July 22, 1999 and found guilty of two counts of first-degree murder and two counts of use of a handgun in the commission of a felony. A sentencing proceeding before the same jury was conducted pursuant to § 413, and Ware was sentenced to death pursuant to the jury's determination. On August 13, 1999, the court sentenced Ware to a term of ten years for the two handgun convictions, to be served consecutively.

## II. Jury Selection Issues

Appellant argues that the trial court committed reversible error during jury selection. He makes three arguments: (a) that the trial judge committed reversible error in denying his motions to strike six prospective jurors for cause; (b) that the trial judge committed reversible error in striking two jurors for cause; and (c) that the trial judge committed reversible error in failing to strike, *sua sponte*, the entire venire panel on the ground that it had been tainted by exposure to media coverage of the case. The State argues that the trial court did not abuse its discretion in ruling on the motions to excuse for cause. As to the court's failure to strike the entire panel, the

State maintains that, because this issue was never addressed to the trial court, the issue has not been preserved for appellate review.

### A. Denial of Defense Motions to Strike for Cause

■ The jury selection proceeded in three stages. We glean from the record that, sometime before the trial began, prospective jurors completed a juror questionnaire.[4] The day before the trial began, the prospective jurors were brought before the judge individually for voir dire questioning. Several venirepersons were excused for cause at this time on the basis of the answers to the questionnaires alone. Each party moved to strike certain jurors for cause; some of these motions were granted, while others were denied or reserved. Finally, on the day of trial, the judge allowed renewal of motions to strike for cause that he had previously denied or reserved. The court then proceeded to select the jury, and the parties exercised their peremptory challenges. The defense exercised nineteen of the twenty peremptory challenges permitted by Maryland Rule 4–313(a)(2), and the State exercised the ten challenges permitted by the rule. Each side exhausted its allotted strikes for the alternates.

Appellant argues that the trial court erred in failing to excuse six prospective jurors for cause, specifically, William Cooper, Sean Haynie, Thomas Leising, Joseph Satterthwait, James McLaughlin, and Sirkka Mitchell. As to Mitchell, Leising, and McLaughlin, the answer is simple. The record reflects that the trial court *granted* the defense motions to strike for cause. The trial judge denied the motions initially, but, when Appellant renewed his motions to strike for cause during the final stage of jury selection, the court excused these individuals. The remaining three prospective jurors, Cooper, Haynie, and Satterthwait, did not serve on the jury;

---

4. The court and the parties repeatedly refer to a questionnaire which had been sent pre-trial to the prospective jurors. Because the court concluded that some of the questions were vague or inartfully drawn, the court engaged in individual voir dire of each prospective juror. We have been unable to locate in the record a copy of the questionnaire.

Appellant exercised a peremptory challenge to excuse each juror.

■ We need not decide whether the trial judge erred in declining to excuse prospective jurors Cooper, Haynie, or Satterthwait because, even if there was error, it was harmless beyond a reasonable doubt. *See Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976). As noted, Appellant did not exhaust his peremptory challenges. "If disqualification for cause is improperly denied, but the accused has not exercised all allowable peremptory challenges, there is no reversible error." *White v. State,* 300 Md. 719, 729, 481 A.2d 201, 205 (1984). Additionally, none of the challenged prospective jurors served on the jury; consequently, it is clear beyond a reasonable doubt that any alleged bias and/or knowledge of the case could not have influenced the verdict either as to the conviction or as to the sentence. *Id.* at 728, 481 A.2d at 205 (stating that "the claimed bias of [a prospective juror unsuccessfully challenged for cause] did not influence the verdict because [the prospective juror] did not serve on the jury").

### B. Granting of Prosecution Motions to Strike for Cause

■ Appellant argues that the trial court should not have excused prospective jurors Marsha Santo and Donald Rabb for cause. In the case of Rabb, Appellant asserts that he should not have been excused because he indicated that he could put aside his personal reservations about the death penalty and deliberate as required by law. In the case of Santo, Appellant argues that the court erred in not permitting defense counsel to ask rehabilitative questions, and, as a result, the court had insufficient information to determine whether the prospective jurors could follow the law.

Santo and Rabb indicated that they would be unwilling to impose the death penalty. Rabb told the court that he absolutely would not impose the death penalty "where a person went off and there was a love interest involved." The State represents in its brief that Santo "appeared to indicate on her questionnaire that the death penalty should be imposed

for every first degree murder, [but] when questioned, she responded that she did not believe she could impose the death penalty under any circumstances."

The Sixth and Fourteenth Amendments to the United States Constitution require that the jury at a capital sentencing proceeding be fair and impartial. *See, e.g., Morgan v. Illinois*, 504 U.S. 719, 728, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); *Evans v. State*, 333 Md. 660, 668, 637 A.2d 117, 121 (1994). The proper standard for determining when a prospective juror may be excluded for cause based on his or her views on the death penalty is whether the juror's views would prevent or substantially impair the performance of his or her duties as a juror in accordance with the court's instructions and the juror's oath. *See Wainwright v. Witt*, 469 U.S. 412, 421, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Evans*, 333 Md. at 671, 637 A.2d at 122. The decision as to whether to excuse a juror for cause is ordinarily left to the sound discretion of the trial judge and will not be disturbed on appeal except for an abuse of discretion. *See Witt*, 469 U.S. at 426, 105 S.Ct. 844 (noting that deference is to be paid to trial judge's decision to strike juror for cause); *Bowie v. State*, 324 Md. 1, 20, 595 A.2d 448, 457 (1991) (same). The trial court is in the best position to assess a juror's state of mind, by taking into consideration the juror's demeanor and credibility.

The responses of jurors Santo and Rabb establish that they could not consider the death penalty under any circumstances. The record supports the trial judge's decision to excuse the prospective jurors for cause based on their opposition to capital punishment. Moreover, as to prospective juror Santo, Appellant acquiesced in the ruling.[5] *See Dietz v. Dietz*, 351

---

5. The relevant portion of the voir dire of Santo and of the subsequent colloquy between counsel and the court follows.

[STATE'S ATT'Y:] Okay. Is it your belief that not under any circumstances would you be able to sit on a jury and say that you believe that a person should be sentenced to death?
MS. SANTO: No, I don't feel that I could.
[STATE'S ATT'Y:] Not under any circumstances?
MS. SANTO: No.

Md. 683, 689, 720 A.2d 298, 301–02 (1998); *Osztreicher v. Juanteguy*, 338 Md. 528, 659 A.2d 1278 (1995); *Watkins v. State*, 328 Md. 95, 99–100, 613 A.2d 379, 381 (1992); *Rocks v. Brosius*, 241 Md. 612, 630, 217 A.2d 531, 541 (1966). The trial court did not abuse its discretion and properly excused both jurors.

## C. The Court's Failure to Strike, Sua Sponte, the Entire Panel

Appellant next argues that the record establishes that the pool of jurors knew from media accounts that Appellant had been convicted previously and that the jurors had discussed the matter in the courthouse. He maintains that, as a result, the trial court should have struck the entire panel on its own motion. Appellant never objected to the array. Appellant argues that, either as plain error or as coming within the relaxed application of preservation requirements in capital cases, this Court should consider the issue. The State maintains that a review of the record demonstrates no basis for the court to have disqualified the entire array. The State argues that it is unrealistic to expect potential jurors in the county

---

[STATE'S ATT'Y:] I don't have any other questions.
THE COURT: Would you wait outside a moment, please, ma'am.
MS. SANTO: Uh-huh.
[STATE'S ATT'Y:] Motion for cause.
THE COURT: The court grants it.
MR. WARREN: Do we even get a chance to explore whether or not she could weigh?
THE COURT: That she what?
MR. WARREN: If she were instructed otherwise. I didn't get a chance to explore whether or not she could—
THE COURT: Her answer—
MR. GUNNING: But I don't think that she would.
MR. WARREN: *Okay. You are right.*
Appellant was represented by two attorneys, Gunning and Warren. Warren objected on the ground that if further questioning had been permitted, the witness might have stated her ability to put her personal views aside and abide by the court's instructions. Gunning obviously disagreed. Attorney Warren replied that Gunning was right, and said no more on the subject. This discussion represented agreement by Appellant's attorneys that the judge's ruling was correct. They acquiesced in the ruling.

not to have *some* knowledge of the case, particularly a capital case. If counsel believed that the publicity was so pervasive and overwhelming, he could have moved for automatic removal of the case under Maryland Rule 4–254(b).

Maryland Rule 4–312(a) addresses a party's challenge to the array. The rule provides as follows:

A party may challenge the array of jurors on the ground that its members were not selected, drawn, or summoned according to law or on any other ground that would disqualify the panel as a whole. A challenge to the array shall be made and determined before any individual juror from that array is examined, except that the court for good cause may permit it to be made after the jury is sworn but before any evidence is received.

Because defense counsel did not raise the issue at any time below, the issue is waived. We find no plain error and, accordingly, we reject Appellant's argument that the trial court should have, *sua sponte,* excused the entire panel.

As we have indicated, it appears that a questionnaire was sent to all prospective jurors. On the questionnaire, the prospective jurors were asked about their knowledge of the case from news reports and other sources. It appears that an affirmative questionnaire answer indicating knowledge of the case prompted specific inquiry by the trial court.

Appellant points to the voir dire testimony of fourteen prospective jurors to support his argument that the entire panel was tainted. Upon questioning, prospective jurors Satterthwait, Norwood, Hendricks, Brown, Wilbur, Mitchell, and Bolick said that they had read something in the local newspaper about the case, that Ware had been tried previously, and the conviction reversed. Prospective jurors Pierce, Vanscoy, Matulevich, Stummer, and Levesque heard talk in the courthouse to the same effect. Two of these prospective jurors had heard that Appellant had been sentenced to death. All fourteen individuals stated that their knowledge would not prevent them from judging the case fairly and impartially on the basis of the evidence presented in court alone. Five of the fourteen

were stricken for cause, and six others were excused on peremptory challenges. The remaining three prospective jurors, Brown, Levesque, and Vanscoy, served on the jury. Vanscoy was excused before the end of the guilt/innocence phase and was replaced by an alternate; thus, she did not participate in the deliberations or verdict. Appellant never moved to strike any of these three for cause, and, as noted above, Appellant did not exhaust his peremptory challenges.

Appellant does not appear to be complaining that any of the fourteen jurors were not excused for cause. His complaint appears to be that, based on the voir dire of those jurors, it is evident that the entire panel was tainted and should have been disqualified. The record does not support Appellant's claim.

■ A criminal defendant's right to a fair and impartial jury is guaranteed by the Sixth and Fourteenth Amendments and Article 21 of the Maryland Declaration of Rights. The Supreme Court has spoken several times to the application of this protection to criminal cases in which the venire has been exposed to pretrial publicity about the case. Juror knowledge of a case *alone* does not make the trial unfair:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). *See also Calhoun v. State,* 297 Md. 563, 580, 468 A.2d 45, 52 (1983).

This same notion was expressed by the Supreme Court in *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). There, the Court set out the standard for juror impartiality in pretrial publicity cases:

The constitutional standard of fairness requires that a defendant have a panel of impartial, indifferent jurors. Qualified jurors need not, however, be totally ignorant of the facts and issues involved. . . . At the same time, the juror's assurances that he is equal to [the task of laying aside his impression or opinion and rendering a verdict based on the evidence presented in court] cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.

*Id.* at 799–800, 95 S.Ct. 2031 (citations and internal quotations marks omitted). It is important to "distinguish between mere familiarity with petitioner or his past and an actual predisposition against him." *Id.* at 801, n. 4, 95 S.Ct. 2031.

In Maryland, we have had a number of occasions, in cases in which pretrial publicity was at issue, to state that a prospective juror is not disqualified automatically by pretrial knowledge of the case or preconceived opinions of the accused's guilt or innocence. Chief Judge Murphy, writing for the Court in *Couser v. State,* 282 Md. 125, 138, 383 A.2d 389, 396–97 (1978), stated:

It is true, of course, that the due process clause of the fourteenth amendment and Article 21 of the Maryland Declaration of Rights guarantee the right to an impartial jury to an accused in a criminal case; these constitutional guarantees do not, however, insure that a prospective juror will be free of all preconceived notions relating to guilt or innocence, only that he can lay aside his impressions or opinions and render a verdict based solely on the evidence presented in the case. *See Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Newton v. State,* 147 Md. 71, 127 A. 123 (1924); *Garlitz v. State,* 71 Md. 293, 18 A. 39 (1889).

Applying these standards, we cannot say on the record before us that Appellant's right to a fair trial was violated by some unknown prospective jurors' purported knowledge of the case derived from pretrial publicity or discussion in the courthouse outside the courtroom. Appellant has failed to satisfy his burden to demonstrate the actual existence of such an opinion in the mind of any juror or such facts in the record as will raise a presumption of partiality. We hold that the trial court did not err in failing to strike, *sua sponte*, the entire jury panel.

## III. Trial Issues

### A. Admission of Allegedly Irrelevant and Unfairly Prejudicial Testimony

Appellant argues that the trial court erred in admitting irrelevant and prejudicial evidence when it admitted evidence of threats made to two witnesses, Adrian and Thomas Washington, evidence that Appellant had hit Kristi previously, and evidence that Appellant carried a gun. Appellant argues that this evidence was admitted improperly because the evidence was irrelevant, and, even if relevant, its probative value was outweighed by the potential for unfair prejudice. Therefore, the evidence should have been excluded under Maryland Rule 5–403.[6] Because the evidence here at issue involves, at least arguably, some form of misconduct on the part of Appellant, Rule 5–404(b), the rule excluding so-called bad acts evidence, is also implicated.[7]

---

6. Rule 5–403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

7. Rule 5–404(b) reads as follows:

**Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent,

### 1. Testimony that Ware Threatened Thomas and Adrian Washington

On the day of the murders, Thomas Washington, who was the husband of a relative of Kristi Gentry, spoke to Ware by telephone while Ware was at the Gentrys' house. Appellant moved in limine to preclude Thomas from testifying to some statements Ware made in this telephone call. In particular, Appellant sought exclusion of Thomas's proffered statement that Ware had asked Thomas whether he "was bulletproof." Appellant argues that the evidence was irrelevant, that it was at best a threat against Thomas, and that any probative value was outweighed by the prejudice. The trial court denied the motion.

At trial, Thomas testified, and Appellant objected:

[THOMAS:] When we first started conversing it was pretty normal. But towards the end of our conversation it started getting more aggressive, and he started getting a little bit more boisterous with his attitude toward me, and I was trying to help out my family member.

[STATE'S ATT'Y:] Okay. And how did that conversation end?

[THOMAS:] It ended with him basically asking me was I bulletproof.

[DEF. ATT'Y:] Objection. Move to strike.

THE COURT: Overruled.

[STATE'S ATT'Y:] What did defendant say to you?

[THOMAS:] He asked me was I bulletproof, he told me he knew where I lived and that he basically was going to get me and my punk-ass brother [i.e., Adrian Washington].

[DEF. ATT'Y:] Objection. Move to strike.

THE COURT: Overruled.

We begin our analysis by repeating that the trial court is afforded great deference in its rulings on admissibility

preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

of evidence and that rulings as to relevancy will not be disturbed on appeal unless there is a clear abuse of discretion. *See Hopkins v. State,* 352 Md. 146, 158, 721 A.2d 231, 238 (1998). The trial judge's conclusion that Thomas's testimony was relevant is amply supported by the record.

Appellant's statements to Thomas were made approximately three hours before the murders. Thomas's testimony is probative of the proposition that, within the pertinent time frame, Appellant was angry and in a violent frame of mind, and reacted during that time to objects of his anger with an impulse to shoot them. This proposition is probative of Appellant's motive to kill Kristi. While the testimony may have been prejudicial, it was not unfairly so under the facts of the case. We find no error.

## 2. Testimony that Ware Had Assaulted Kristi Gentry on a Prior Occasion

Kevin Gentry testified that, three months before the altercation with Ware on December 30, 1993, he had told Ware that "if he ever put his hands on my sister again, I would beat him up." Appellant argues that this testimony was inadmissible evidence of prior misconduct, carried no probative value, and was prejudicial.

After the telephone conversation described above between Thomas and Ware, Thomas telephoned Kevin Gentry, Kristi's brother. Kevin testified as a prosecution witness that, after speaking to Thomas, he drove to the Gentry house, where he confronted Ware, engaged in an altercation with him, and ejected him from the house. The prosecutor asked Kevin, "what prompted you to beat Mr. Ware up in that manner?" The defense objected, and, at the bench, the State argued that the jury should know that Appellant had hit Kristi on a previous occasion, leading Kevin to warn him that he would be beaten if it happened again. The State proffered that the witness would testify that "on a previous occasion there was an altercation, and he told Ware, if you ever lay hands on my sister again, I am going to beat you up without any further

conversation." The State argued that without this testimony, it would "look[ ] like he just went in and beat Ware up for no reason."

The court overruled the objection, concluding that the evidence was not offered for its truth, but simply to show why Kevin acted as he did. The witness told the jury: "If he ever put his hands on my sister again, I would beat him up."

Relying on Rule 5–404(b), Appellant argues that the testimony was irrelevant to any issue in the case, because the action the testimony was meant to justify was itself irrelevant to any issue in the case. He maintains that Kevin Gentry's testimony left the jury to speculate as to what Appellant had previously done to Kristi, when it occurred, and whether it demonstrated a propensity to engage in violence against her.

At the outset, we note that evidence of the deterioration in Ware and Kristi's relationship came from many sources without objection. Several witnesses testified that the arguments between the two had escalated to the point of physical violence.

Kevin had testified that he knew Ware as his sister's boyfriend. When he arrived at the Gentry residence on December 30, 1993, Kevin saw Ware's car. Kevin rang the doorbell and, when Ware opened the door, Kevin began hitting Ware. The testimony in question was offered to explain Kevin's actions. The testimony was relevant to put Kevin's conduct in context. It was not offered for its truth, but simply to show why Kevin acted as he did.

The evidence that Kevin hit Ware the morning of the murders was relevant to show Ware's escalating anger towards Kristi on the day of the murder. In fact, several witnesses testified to this escalating anger and Appellant's build-up of rage towards Kristi. It is the function of the trial judge to assess the probative value of evidence and to weigh the probative value against the prejudicial effect. The trial judge did not abuse his discretion.

 

### 3. Testimony that Ware Constantly Carried a Gun

Appellant argues that the trial court erred in admitting testimony of the State's witness, Sean LeBere, that Appellant had a gun and that he always carried it with him. Sean LeBere was an acquaintance of Ware's for six or seven months preceding the murders. LeBere testified that he saw Ware about two or three days per week during this period. The State asked LeBere, "During the six or seven months before December 30th of 1993, did you ever see the Defendant with a gun?" The defense objected on grounds of relevancy. The State argued that the evidence was relevant because the murders were committed with a gun, which was never found, and the testimony tended to show that Ware possessed a gun. Defense counsel argued that conduct beginning six to seven months before the murders was irrelevant and that "[h]is habits are irrelevant." The court overruled the objection, and, in response to the question of how often LeBere had seen Ware with a gun, LeBere answered, "He always carried one with him."

Although conceding that evidence that he possessed a gun close to the time of the murders was relevant, Appellant argues that evidence that he did so continuously over a period of several months preceding the murders is not relevant and that it violates Maryland Rule 5–404(b). The State argues that LeBere's testimony that Ware always carried a gun was as relevant as the testimony of other witnesses that Ware had a gun a short time before the murders and that, in light of this other unobjected to testimony that Ware carried a gun frequently, any error in the admission of LeBere's testimony was harmless.

Appellant objected below on the grounds that the evidence was irrelevant and that its prejudicial effect outweighed its probative value. Appellant's argument that the evidence ran afoul of Rule 5–404(b) was never made to the trial court and therefore was not preserved. *See Klauenberg v. State*, 355 Md. 528, 541–42, 735 A.2d 1061, 1068 (1999) (holding that a defendant waives the right to argue on appeal that testimony

was inadmissible bad acts evidence when the only objection at trial was on grounds of relevancy).

We hold that the trial court did not err in admitting the testimony. It was relevant to establish that Ware possessed a gun and as evidence of habit that he carried a gun.

Evidence of a person's habit is explicitly deemed relevant by Rule 5–406 to prove action in conformity with the habit:

Evidence of the habit of a person or of the routine practice of an organization is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Evidence that a person has a habit of doing something is relevant to show that the person engaged in the conduct on a particular occasion. Here, evidence that Ware was in the habit of carrying a gun made it more likely that he had a gun on the day of the murders. This was habit evidence, admissible under Rule 5–406, and not evidence of a bad act to show character under Rule 5–404(b).[8] There was no error.

### B. Admission of Testimony That Law Enforcement Officials Previously Testified to a Witness's Truthfulness

Ware argues that the testimony of Edward Anderson, a critical witness for the State, that certain law enforcement officials had testified at Anderson's hearing on his motion to reduce his sentence (in an unrelated case) that he had given them truthful information regarding these murders—the same information to which he testified in Ware's

---

**8.** Professor McLain, in her learned treatise on evidence, addresses the acceptable methods of proving habit under Rule 5–406:

Proof of an individual's habit may be made in three ways: (1) by the individual himself or herself, who has lost his or her memory as to the specific occasion; (2) by another person who has seen the individual take that action on repeated occasions; or (3) by various individuals who have seen the individual take the particular action on different occasions.

5 LYNN MCLAIN, MARYLAND EVIDENCE § 406.1, at 402 (1987 & Supp.1995). Anderson's testimony fell into category (2).

trial—was admitted in error. Ware argues that Anderson's credibility was a central issue in this trial and that, when the trial court permitted Anderson's credibility to be bolstered improperly through the opinions of a prosecutor and police detective that Anderson was telling the truth, the trial court committed reversible error.

Anderson, an inmate at the Department of Corrections serving a life sentence at the time of the murders, testified for the State. Anderson testified that he was a friend of Kristi Gentry and that Cynthia Allen was the mother of his child. On the day of the murders, Anderson testified, he had telephoned the Gentrys' house from prison and spoken to Kristi and Cynthia. Anderson testified that Cynthia told him, "Darris is here," and that Ware and Kristi were "fussing." Anderson also testified that he heard Kristi screaming, and then heard three gunshots, followed by silence; afterward, someone hung up the phone on the Gentrys' end.

On cross-examination, Ware's counsel attempted to show that Anderson's testimony was motivated by a desire to obtain leniency in his own case. Anderson testified on cross-examination that, before Ware's first trial, his counsel had filed a motion for modification of his life sentence. He also testified that he brought to the attention of the sentencing judge the fact that he was testifying in the instant case. At the hearing on this motion, Anderson called as witnesses an Anne Arundel County police detective and a prosecutor from the Anne Arundel State's Attorney's Office to testify regarding Anderson's actions in informing them of the conversation that he had heard on the telephone.

On redirect, the prosecutor inquired further regarding the testimony of the detective and prosecutor at the modification hearing:

[STATE'S ATT'Y:] And, Mr. Anderson, you were present when they testified?

ANDERSON: Yes, ma'am.

[STATE'S ATT'Y:] Okay. And you heard their testimony?

ANDERSON: Yes, ma'am.

[STATE'S ATT'Y:] And can you tell us whether or not they testified to anything other than the facts of what you had testified to?

[DEF. ATT'Y:] Objection as to the characterization of that.

THE COURT: I overrule that. You can answer that.

ANDERSON: *They just testified that I was—that I was being truthful in bringing them this information. That's all.*

Appellant argues that evidence that a prosecutor and a police detective had testified under oath that Anderson "was being truthful" in the information that he presented was improper and highly prejudicial in that it vouched for his credibility and the truth of his testimony. Appellant cites *Bohnert v. State*, 312 Md. 266, 539 A.2d 657 (1988), in which we held that a social worker's expert testimony that a child was a victim of sexual abuse, supported only by the child's averments, was tantamount to a declaration that the child was telling the truth and the defendant was lying, and therefore invaded the province of the jury. *See id.* at 276, 278–79, 539 A.2d at 662–63.

It is the law of this State "that a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth. Testimony from a witness relating to the credibility of another witness is to be rejected as a matter of law." *Id.* at 278, 539 A.2d at 663. In *Bohnert,* we said:

In a criminal case tried before a jury, a fundamental principle is that the credibility of a witness and the weight to be accorded the witness' testimony are solely within the province of the jury. *Battle v. State*, 287 Md. 675, 685, 414 A.2d 1266 (1980). Therefore, the general rule is that it is error for the court to make remarks in the presence of the jury reflecting upon the credibility of a witness. *Elmer v. State*, 239 Md. 1, 10–11, 209 A.2d 776 (1965). It is also error for the court to permit to go to the jury a statement, belief, or

opinion of another person to the effect that a witness is telling the truth or lying. *Thompson v. Phosphate Works,* 178 Md. 305, 317–319, 13 A.2d 328 (1940); *American Stores v. Herman,* 166 Md. 312, 314–315, 171 A. 54 (1934). The Court of Special Appeals said in *Mutyambizi v. State,* 33 Md.App. 55, 61, 363 A.2d 511 (1976), *cert. denied,* 279 Md. 684 (1977):

> Whether a witness on the stand personally believes or disbelieves testimony of a previous witness is irrelevant, and questions to that effect are improper, either on direct or cross-examination.

*Id.* at 277, 539 A.2d at 662. *See* JOSEPH MURPHY, JR., MARYLAND EVIDENCE HANDBOOK § 603(C), at 250 (3d ed.1999) (stating that a witness is not permitted "to express an opinion that another person's specific testimony is true or false"). In *Bohnert,* this Court reversed the conviction. *See Bohnert,* 312 Md. at 279, 539 A.2d at 663.

In the instant case, Anderson's testimony that the prosecutor and detective said he was being truthful when he brought information to them was inadmissible. *Bohnert,* however, is distinguishable. In *Bohnert,* the State called a witness before the jury to bolster the credibility of another witness. In this case, we merely have the self-serving statement of the witness saying that others thought he was being truthful. Here we have Anderson basically saying: I am telling you the truth. I am telling you also that two others said I am telling the truth. Although distinguishable from *Bohnert,* we do not think the testimony was proper. Nevertheless, the form of the evidence reduced its prejudicial impact. Anderson made a self-serving statement to the effect that certain persons not present once affirmed, on an unknown basis, his truthfulness in making the statements he again made at trial. Such a statement, by a witness whose credibility is in question, is far less weighty than the expert testimony in *Bohnert,* and its effect on the jury was likely to be insignificant. Moreover, it is implicit that the police believed Anderson or they would not have gone to bat for him at the hearing on his motion to reduce his sentence. Although error, we hold that the error was harm-

less beyond a reasonable doubt. We are "satisfied that there is no reasonable possibility that the evidence complained of ... may have contributed to the rendition of the guilty verdict." *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

## C. Prosecutor's Closing Argument

■ Appellant next asserts that the trial court erred in permitting improper closing argument. He argues that, in her closing argument to the jury, the prosecutor's argument depended on speculation regarding facts not in evidence and that the court erroneously denied Appellant's request to strike these comments and to instruct the jury to disregard the improper argument.

Jeffrey Allen, Cynthia Allen's husband, testified that Ware came to the Allens' house at about 12:45 on December 30, 1993 and that he had his hands "[f]olded with one hand in his jacket." Ware departed shortly after he arrived. In her closing argument, the prosecutor described the shootings, noting that Cynthia Allen had been on the telephone talking to Edward Anderson. The prosecutor then continued as follows:

> But then, one more thought occurs to [Ware]. Who was Cynthia on the phone with when he fired those first shots? Jeffrey? There can't be any witnesses to this crime. I have eliminated Cynthia, I am going to get rid of the gun, but was it Jeffrey on the other end of the phone? Did he hear the gunshots?

> What does the Defendant do? He leaves the home. The murders happen at 12:31. We know that is when the phone was hung up. He arrives at Jeffrey Allen's house at about 12:45. Jeffrey Allen doesn't know that there is anything wrong yet.

Defense counsel objected, and a bench conference followed. Defense counsel contended that the State's argument was pure speculation as to what was in Ware's mind at the time he went to the Allen home. He also argued that there was no evidence as to whether Ware had a gun when he went over to

the house. He argued that, since Ware was not charged with any offense against Jeffrey Allen, any reference to eliminating Allen should be stricken and the jury instructed to disregard the comment. The State argued that the comments were an appropriate response to the assertion in Appellant's opening statement that his actions after the crime were consistent with his innocence and that she was entitled to argue about why he went to the Allens' house. The court agreed with Appellant that it would be improper to imply that Ware had his gun in his pocket. The judge said, "I am not going to allow you to say where is his gun, but everything else is okay." The prosecutor resumed her closing argument:

Ladies and gentlemen, the Defendant goes to Jeffrey Allen's house. Jeffrey Allen tells you what he is wearing. The red ski jacket, the blue pants, and he tells you that his hands are in his pocket. Of course, that is significant, ladies and gentlemen.

The Defendant is satisfied that Jeffrey Allen is aware of nothing at that point and he leaves.

Appellant argues that the prosecutor's closing argument was unsupported by the evidence and that the State could not prove that Ware went to Allen's house armed and intending to kill Allen. He maintains that this inference argued by the State was pure speculation about possible other crimes and, as such, was highly prejudicial. The State's threshold position is that the issue is not preserved for our review, because defense counsel did not object after the prosecutor resumed her argument. On the merits, the State argues that the prosecutor never argued or inferred that Ware went to the Allen house to eliminate a witness.

We find that the issue is preserved, and we shall address the merits. Appellant objected to the argument and now asserts that the trial court erred in failing to strike the argument and to instruct the jury to disregard it.

We begin by noting that, as a general rule, attorneys have great leeway in closing arguments. *See Degren v. State,* 352 Md. 400, 429, 722 A.2d 887, 901 (1999). Attorneys

are permitted to comment on the evidence and to state all reasonable inferences that may reasonably be drawn from the evidence. *See Wilhelm v. State*, 272 Md. 404, 412–13, 326 A.2d 707, 714 (1974). This wide latitude, however, is not unlimited and does not include the right to discuss facts not in evidence. *See Degren*, 352 Md. at 430, 722 A.2d at 901–02; *Collins v. State*, 318 Md. 269, 279, 568 A.2d 1, 6 (1990). On the other hand, discussing facts not in evidence is not necessarily grounds for reversal. Judge Cathell, writing for the Court in *Degren*, noted:

> Not every improper remark, however, necessarily mandates reversal, and what exceeds the limits of permissible comment depends on the facts in each case. We have said that reversal is only required where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused. This determination of whether the prosecutor's comments were prejudicial or simply rhetorical flourish lies within the sound discretion of the trial court. On review, an appellate court should not reverse the trial court unless that court clearly abused the exercise of its discretion and prejudiced the accused.

*Degren*, 352 Md. at 430–31, 722 A.2d at 902 (citations, alterations, and internal quotations omitted). *See also Oken v. State*, 327 Md. 628, 612 A.2d 258 (1992); *Jones v. State*, 310 Md. 569, 530 A.2d 743 (1987), *judgment vacated on other grounds*, 486 U.S. 1050, 108 S.Ct. 2815, 100 L.Ed.2d 916 (1988); *Reidy v. State*, 8 Md.App. 169, 259 A.2d 66 (1969). "The permissible scope of closing argument is a matter left to the sound discretion of the trial court. The exercise of that discretion will not constitute reversible error unless clearly abused and prejudicial to the accused." *Booth v. State*, 306 Md. 172, 210–11, 507 A.2d 1098, 1118, *judgment vacated in part on other grounds*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987).

Although there is no direct evidence regarding Ware's reason in going to Allen's house, the prosecutor recounted facts in evidence. Defense counsel, in his opening statement,

argued that Ware's actions on the day of the murders were consistent with innocence. The State was entitled to show, directly or circumstantially, that such was not the case. Ware's appearance at the Allen house could have been construed as circumstantial evidence supporting the theory that he went there to cover up the crime. We find no error.

### D. Exclusion of Testimony of Antonio Barnes

Appellant argues that the trial court erred when it sustained the State's objection to the testimony of Appellant's roommate, Antonio Barnes, that Appellant instructed Barnes to tell Kristi Gentry that Appellant was on his way to the Gentrys' house shortly before the murders. Appellant argues that the statement was not hearsay and was admissible as inconsistent with a premeditated intent to murder Kristi.

Antonio Barnes was called as a State's witness and testified on direct examination that he had known Ware for a couple of years and became his roommate in October, 1993. Barnes also testified on direct examination to Ware's possession of a gun and to the search of their apartment after the shootings. On cross-examination by Ware's counsel, Barnes said that around midnight on the night of December 29, 1993, he received a phone call from Kristi. Barnes agreed to tell Ware that she had called.

When the State concluded its examination of Barnes, defense counsel informed the court that Barnes was to be recalled as a defense witness. As a courtesy to Mr. Barnes, the court permitted the defense examination of Barnes, out of turn, and in the State's case-in-chief. Barnes testified that he saw Ware at about 11:30 a.m. on December 30, 1993, when Ware returned to the apartment to change his clothing. As Ware left the apartment, he gave instructions to Barnes. The State objected when defense counsel asked Barnes to relate the instructions he had given to him. Defense counsel proffered that Barnes would testify that *Ware told him to tell Kristi, if she called, that he was on his way over.* Defense counsel argued that the State would be introducing evidence

that would make Barnes' testimony relevant. The trial judge stated that, since Barnes had . been called out-of-turn and during the State's case, he did not know what the State was going to offer. The judge sustained the objection, ruling that Ware could recall Barnes as a witness later.

■ Trial judges have broad discretion in determining the order of presentation of evidence.[9] *See McCray v. State*, 305 Md. 126, 133, 501 A.2d 856, 860 (1985) (recognizing that "trial judges have broad discretion in the conduct of trials in such areas as the reception of evidence"). In sustaining the State's objection, the trial court properly exercised its discretion. The court merely excluded this evidence until a later point in the trial; defense counsel never re-offered the testimony. We perceive no abuse of this discretion.

Appellant's sole argument before this Court is that the trial court erroneously excluded the testimony on hearsay grounds. Appellant is wrong in concluding that hearsay was the basis for the court's ruling. In fact, the judge never ruled that the evidence was inadmissible per se. The court merely ruled that it was irrelevant when offered.

The trial judge properly exercised his discretion in ruling that, when Appellant offered the evidence, it was not relevant and that Appellant could recall the witness at a later point in the trial. The discretion to vary the usual order of proof is well within the trial court's discretion. *See, e.g., McCray*, 305 Md. at 133–34, 501 A.2d at 860; *State v. Hepple*, 279 Md. 265, 270–71, 368 A.2d 445, 449 (1977). The judge had varied the order of proof in permitting the direct examination of Barnes by the defense during the State's case-in-chief. In sustaining an objection to part of the testimony, the judge properly

9. Maryland Rule 5–611(a) requires trial judges to manage the order of presentation of evidence:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

exercised his discretion in controlling the order of proof, thereby permissibly requiring Ware to recall the witness later in the trial if he so desired. Nothing prevented Ware's counsel from recalling the witness. We find no error.

### E. Evidence of Ware's Demeanor While Giving a Statement to the Police

■■■ Appellant argues that the testimony of a police officer that Appellant "would . . . sweat, . . . tense up in his chair and . . . try to push himself away from me and . . . choke a little when he spoke" during his interrogation was irrelevant and implied that Appellant was being untruthful when he was being questioned about the shootings. He argues a violation of due process. The State argues that the officer's testimony was nothing more than his observations of Ware during the interview.

Officer Michael Praley testified for the State regarding the statement that Appellant made to him the on the day of the murders. In response to the prosecutor's question about Ware's demeanor, the officer responded:

He was calm. But at times there was a—during my hours of interviewing him, the rhythm of questions leading to him shooting both these girls, I observed that he would—he would sweat, that he would tense up in the chair and that he would try to push himself away from me slightly and that he would choke a little as he spoke. * * * Like he would—in his voice would be a rasp and a choke and the words that he would speak.

The officer said that he noted these observations when he questioned Ware specifically about the shooting, but that Ware was calm when he discussed matters that happened the night before the shootings.

Officer Praley testified to his observations of Ware's physical appearance and manner of speaking; he never expressed an opinion as to Ware's truthfulness. There were no accusations of lies or inconsistencies. As to Ware's demeanor, the significance was for the jury to assess. We perceive no error.

## IV. Sentencing Phase

### A. Evidence of Victims' Families' Opposition to Death Sentence

■■■ Appellant proffered evidence that some of the victims' family members did not wish to see a death sentence imposed because of the anxiety and uncertainty that would result from the possibility of a future successful attack upon the sentence. The trial court ruled that the evidence was not relevant and hence inadmissible. We agree.

Appellant argues that the evidence was admissible for two purposes. First, he argues that it was admissible as a potential mitigating circumstance under § 413(g)(8), the catch-all provision, and may not be restricted under the Eighth Amendment to the United States Constitution. Second, he argues that it was admissible to respond to the victim impact evidence introduced by the State. His theory is that victim impact evidence may establish that a family member is plagued by grief, fear, and anxiety. Evidence that a family member opposes a death sentence is directly responsive because of its tendency to show that at least some of these emotions may be reduced in intensity or severity by a sentence of life without parole.

In *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the United States Supreme Court held that a jury should "not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." A plurality of the Court also noted that "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 605 n. 12, 98 S.Ct. 2954.

Victim impact evidence is admissible during capital sentencing. The United States Supreme Court held in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720

(1991), that admission of victim impact evidence during capital sentencing does not violate the Eighth Amendment. The Court held that "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a type long considered by sentencing authorities." 501 U.S. at 825, 111 S.Ct. 2597. The sentencing authority, however, may not consider statements of the victim's family that amount to an opinion regarding the appropriate sentence to be imposed upon the defendant. *See Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), *overruled in part on other grounds, Payne v. Tennessee,* 501 U.S. at 830 & n. 2, 111 S.Ct. 2597.

In overruling *Booth,* the Supreme Court in *Payne* did not disturb the Eighth Amendment proscription against the introduction of victim statements that the death penalty should be imposed.[10] *See Robison v. Maynard,* 943 F.2d 1216, 1217 (10th Cir.1991); *State v. Hoffman,* 123 Idaho 638, 851 P.2d 934, 941 (1993); *State v. Muhammad,* 145 N.J. 23, 678 A.2d 164, 172 (1996); *State v. Pirtle,* 127 Wash.2d 628, 904 P.2d 245, 269 (1995).

---

**10.** The Supreme Court of Alabama, in *Ex parte McWilliams,* 640 So.2d 1015, 1017 (1993), discussed the effect of *Payne v. Tennessee* on the Court's ruling in *Booth v. Maryland,* concluding that *Payne* only partially overruled *Booth.* The court stated:

In *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) the United States Supreme Court vacated a death sentence, holding that it violated the defendant's Eighth Amendment rights for the sentencer to consider victim impact statements in sentencing the defendant to death. The victim impact statements in that case contained the same types of information as were in the statements in the present case. In *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Supreme Court partially overruled *Booth.* The court in *Payne* held that the defendant's Eighth Amendment rights were not violated by the trial court's consideration of statements regarding the victims and the impact of their deaths upon the family members. The victim impact statements in *Payne* did not contain characterizations or opinions about the defendant, the crime or the appropriate punishment. That portion of *Booth* that proscribed the trial court's consideration of that type of statement was therefore left intact by *Payne.*

In *Robison v. Maynard*, the United States Court of Appeals for the 10th Circuit held that "the opinion of a relative of a victim is irrelevant to the jury's determination of whether the death penalty should be imposed." 943 F.2d at 1217. The court concluded that such testimony is "calculated to incite arbitrary response" from the jury. *Id.* Interpreting *Payne,* the 10th Circuit stated:

> *Payne* merely put aside the bar to the introduction of and comment upon victim impact evidence which had been created in *Booth [v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987)] and *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). The Court did not expand the universe of admissible relevant mitigating evidence established by *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).... We cannot agree that *Payne* portends admissibility of any evidence other than that related to the victim and the impact of the victim's death on the members of the victim's family. Nothing said by the Court suggests the Court intended to broaden the scope of relevant mitigating evidence to include the opinion of a victim's family member that the death penalty should not be invoked.

*Id.*

The Maryland General Assembly has exercised its prerogative to permit victim impact evidence by requiring the Department of Parole and Probation to prepare a pre-sentence investigation report for consideration by the judge or jury at sentencing. *See* Maryland Code (1957, 1997 Repl.Vol., 1999 Supp.) Art. 41, § 4–609(d). By statute, a victim impact statement must be included in this report. *See* Maryland Code (1957, 1996 Repl.Vol., 1999 Supp.) Art. 27, § 781; *Evans v. State*, 333 Md. 660, 685, 637 A.2d 117, 130 (1994).

Section 413(g) addresses mitigating factors. The statute enumerates seven statutory mitigators, and an eighth "catch-all" provision, providing as follows:

If the court or jury finds, beyond a reasonable doubt, that one or more of these aggravating circumstances exist, it shall then consider whether, based upon a preponderance of the evidence, any of the following mitigating circumstances exist:

(1) The defendant has not previously (i) been found guilty of a crime of violence; (ii) entered a plea of guilty or nolo contendere to a charge of a crime of violence; or (iii) had a judgment of probation on stay of entry of judgment entered on a charge of a crime of violence. As used in this paragraph, "crime of violence" means abduction, arson in the first degree, escape in the first degree, kidnapping, manslaughter, except involuntary manslaughter, mayhem, murder, robbery, carjacking or armed carjacking, or rape or sexual offense in the first or second degree, or an attempt to commit any of these offenses, or the use of a handgun in the commission of a felony or another crime of violence.

(2) The victim was a participant in the defendant's conduct or consented to the act which caused the victim's death.

(3) The defendant acted under substantial duress, domination or provocation of another person, but not so substantial as to constitute a complete defense to the prosecution.

(4) The murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder or emotional disturbance.

(5) The youthful age of the defendant at the time of the crime.

(6) The act of the defendant was not the sole proximate cause of the victim's death.

(7) It is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society.

(8) Any other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case.

Section 413(g). Appellant relies on the Section 413(g)(8) mitigator, the so-called catch-all mitigator. A Section 413(g)(8) mitigator is "anything relating to the defendant or to the crime which causes [the jury or any of its individual members] to believe that death may not be appropriate." *Harris v. State*, 312 Md. 225, 253, 539 A.2d 637, 651 (1988) (quoting *Mills v. State*, 310 Md. 33, 51, 527 A.2d 3, 11 (1987), *judgment vacated on other grounds*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988)). In addition, the judge or jury, as the sentencing authority, is free to include as mitigating circumstances "[a]ny other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case." *Tichnell v. State*, 287 Md. 695, 734, 415 A.2d 830, 850 (1980). We reiterated this holding in *Calhoun*, pointing out that, under the Maryland statute, "the sentencing authority may articulate any factor it finds in mitigation." 297 Md. 563, 637, 468 A.2d 45, 81 (1983).

In addition to a victim impact statement included in the presentence report, a victim's family member may testify orally at sentencing. *See* § 780(a).[11] The "permissible scope of victim impact testimony ... lies within the sound discretion of the presiding judge, as limited by Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 413(c)(1)(v)." *Ball v. State*, 347 Md. 156, 197, 699 A.2d 1170, 1189–90 (1997). Admissible evidence is any "evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements."[12] § 413(c)(1)(v).

---

**11.** Article 27, § 780(a) provides as follows:

In every case resulting in serious physical injury or death, the victim or a member of the victim's immediate family ... may, at the request of the State's Attorney and in the discretion of the sentencing judge, address the sentencing judge or jury under oath or affirmation before the imposition of sentence.

**12.** Section 413 provides as follows:

The following type of evidence is admissible in this proceeding:
(i) Evidence relating to any mitigating circumstance listed in subsection (g) of this section;

The trial judge did not abuse his discretion in excluding the testimony that the victim's family did not wish a death sentence imposed. Opinions that Appellant should not receive a sentence of death have no bearing as to defendant's character, prior record, or the circumstances of the offense. They do not qualify as victim impact evidence or rebuttal thereto. Such evidence has no bearing on the actual harm caused by the particular crime. The testimony does not constitute mitigating evidence under the Maryland statute. Because the proffered evidence concerned the appropriate sentence to be imposed on Appellant, it was excluded properly by the trial court. We hold that the trial court did not err by excluding evidence of the victims' families opinion on the death penalty because it was not relevant, even under a loose evidentiary requirement of relevance. The trial court did not exclude evidence of a mitigating circumstance in violation of the Eighth Amendment.

Other jurisdictions that have considered the admissibility of such evidence have reached the same conclusion. *See, e.g., Robison v. Maynard*, 943 F.2d 1216, 1217–18 (10th Cir.1991) (upholding exclusion of victim's sister's testimony that she opposed death penalty as not relevant to mitigation), *superseded by statute*, OKLA. STAT. tit. 22 § 984 (evidence admissible by statute); *Barbour v. State*, 673 So.2d 461, 468–69 (Ala.Ct. Crim.App.1994) (holding that a letter from the victim's brother requesting that defendant receive life without parole was properly excluded since, under *Eddings*, this evidence was not

---

(ii) Evidence relating to any aggravating circumstance listed in subsection (d) of this section of which the State had notified the defendant pursuant to § 412(b) of this article;

(iii) Evidence of any prior criminal convictions, pleas of guilty or nolo contendere, or the absence of such prior convictions or pleas, to the same extent admissible in other sentencing procedures;

(iv) Any presentence investigation report. However, any recommendation as to sentence contained in the report is not admissible; and

(v) Any other evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements.

§ 413(c)(1).

relevant to any mitigating circumstance because it did not pertain to defendant's character, record, or the circumstances of the offense); *Floyd v. State*, 569 So.2d 1225, 1230 (Fla.1990) (finding no abuse of discretion in excluding victim's daughter's testimony that defendant should not be executed); *State v. Clark*, 128 N.M. 119, 990 P.2d 793, 805–06 (1999) (upholding exclusion of clergymen's testimony regarding religious doctrine and opinions about the death penalty); *State v. Bowman*, 349 N.C. 459, 509 S.E.2d 428, 440 (1998) (upholding exclusion of victim's mother's testimony expressing ambivalence about imposition of the death penalty because not evidence of mitigating circumstance since it had nothing to do with defendant's character, record, or circumstances of offense and did not reduce moral culpability of the killing); *State v. Wright*, 323 Or. 8, 913 P.2d 321, 324–27 (1996) (upholding exclusion of opinions as to whether defendant should receive death sentence because not relevant to any mitigating circumstance); *State v. Pirtle*, 127 Wash.2d 628, 904 P.2d 245, 268–69 (1995) (upholding exclusion of victim's essay stating general opposition to death penalty because essay not mitigating evidence and not pertinent to an extenuating circumstance or to defendant's moral culpability).

### B. Jury Instruction Regarding Youthful Age of the Defendant as a Mitigating Factor

 Appellant argues that the jury instruction concerning the mitigating factor of the youthful age of the defendant was inadequate, in that the instruction may have left the jury with the impression that youthful age meant chronological age only. Appellant failed to request the instruction that he now requests and never objected to the instruction regarding youthful age that he now claims was error. Where there has been no timely objection to the giving of or failure to give an instruction, the issue is not preserved. *See* Maryland Rule 4–325(e); *Richmond v. State*, 330 Md. 223, 235, 623 A.2d 630, 636 (1993). The issue is waived. *See* Maryland Rule 8–131; *State v. Tichnell*, 306 Md. 428, 465–66,

509 A.2d 1179, 1198 (1986); *Foster v. State*, 305 Md. 306, 316, 503 A.2d 1326, 1331 (1986). We find no plain error.

Section 413(g) provides that, if the jury or court considering a death sentence finds beyond a reasonable doubt that an aggravating circumstance exists, then it must consider whether any mitigating circumstances exist. The statute sets out a non-exclusive list of possible mitigating circumstances. Section 413(g)(5) states as a statutory mitigator: "The youthful age of the defendant at the time of the crime." In explaining the sentencing form to the jury, the judge said: "For the purposes of the sentencing procedure, a mitigating circumstance is anything about the Defendant or the facts of this case that, in fairness or in mercy, may make the death sentence an inappropriate penalty for the defendant." The court identified the mitigating circumstances for the jury, and in regard to youthful age, stated: "Five, the youthful age of the Defendant at the time of the crime." At the conclusion of the jury instructions, both sides told the court, at the bench, that there were no objections to the instructions as given.

Appellant, who was 22 years old at the time of the murders, argues that the youthful age mitigator in Maryland includes many factors other than chronological age, *see, e.g., Johnson v. State*, 348 Md. 337, 353–54, 703 A.2d 1267, 1275 (1998), and that, without an explicit instruction regarding these other factors, the jury would likely assume that "age" means chronological age only. Appellant introduced the videotaped deposition of expert Laurie James Monroe as evidence of his background and upbringing. He argues that, if given a more detailed instruction, the jury could have considered this evidence, as well as Appellant's lack of experience with the criminal justice system and his "poor anger control evidencing immaturity," when deciding whether the mitigating circumstance of youthful age existed. Finally, Appellant argues that, despite the lack of objection, the sentence should be reversed because the instruction as given was plain error. We disagree.

It is well settled in Maryland that youthful age as used in this statute includes considerations other than mere chronological age, *see Johnson,* 348 Md. at 353–54, 703 A.2d at 1275; *Lovell v. State,* 347 Md. 623, 659–60, 702 A.2d 261, 279 (1997), but instructions on mitigating circumstances for purposes of capital sentencing proceedings are not excepted from the general rule that a party must request a specific instruction before a court is required to give it. Appellant does not contend that the instruction as given contained any misstatement, but only that the instruction "provided the jury with no guidance in assessing the existence *vel non* " of the youthful age mitigator. "The constitutional standard for reviewing an allegedly ambiguous jury instruction is 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.' " *Booth v. State,* 327 Md. 142, 162, 608 A.2d 162, 171 (1992) (quoting *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)).

It is clear from a review of the closing arguments of the State and Appellant that the jury was not misled into believing that the statutory mitigator of youthful age was limited to chronological age only. The State, in closing, conceded that the defendant's age of twenty-two "is not extremely old or very old in terms of chronological age." The prosecutor then went on to argue the maturity of Ware, his actions in the military and service in Desert Storm, and the cold and calculating nature of the crime as evidence of maturity. In response, as to youthful age, defense counsel argued the immaturity of Appellant and that he was "acting out of youth, out of the impetuousness of youth."

A court's obligation to give any particular instruction in a criminal case is governed by Maryland Rule 4–325. Rule 4–325(c) provides:

The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a

requested instruction if the matter is fairly covered by instructions actually given.

Rule 4–325(e) deals with objection and the right to assign error in connection with jury instructions:

No party may assign as error the giving or failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object.

We have long interpreted these rules and their predecessors to mean that a court does not err when it omits an instruction or, in this case, further amplification, that was never requested.

The Supreme Court has established, in capital sentencing proceedings, "that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence, and that the State may structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to it." *Weeks v. Angelone*, 528 U.S. 225, ——, 120 S.Ct. 727, 732, 145 L.Ed.2d 727, 68 U.S.L.W. 4060 (2000). In Ware's case, the jury was explicitly instructed to consider youthful age as a mitigating factor. The instruction given by the trial court was a correct statement of the law, and the jury did not ask for any supplemental instruction as to the meaning of youthful age.[13]

---

**13.** Subsequent to this Court's opinion in *Lovell v. State*, 347 Md. 623, 702 A.2d 261 (1997), the Maryland State Bar Association, Inc., Criminal Pattern Jury Instruction (MPJI–CR) 7:00, addressing the mitigating circumstance of youthful age, was revised to read as follows:

(5) The youthful age of the defendant at the time of the crime. A defendant who is under the age of 18 at the time of the crime cannot be sentenced to death. Youthful age is a flexible and relative concept and is not measured solely by chronological age. Youth, in its

There is no reasonable likelihood that the jury applied the instruction in a way that prevented the consideration of constitutionally relevant evidence of the statutory factor of youthful age. *See Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998); *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). There was no error.

## C. Jury Sentencing

Appellant argues that the trial court erred in failing to take remedial action when Appellant elected to be sentenced by the jury despite his counsel's strong recommendation that he be sentenced by the court. Just before the sentencing hearing began, defense counsel told the court that counsel and Appellant disagreed as to the choice of the sentencing authority. Appellant argues that, under the circumstances, the court was obliged, *sua sponte*, to make an adequate inquiry of Appellant to ascertain that he was competent to make the decision to be sentenced by a jury, one that was against his counsel's recommendation. He also argues that, because he elected to be sentenced by a jury, against the advice of his counsel, and because he disagreed with his counsel about the advisability of being sentenced by the jury, the court should have conducted a hearing to determine whether counsel could continue to represent him. At a minimum, Appellant argues, the court should have granted him a postponement to allow his counsel to prepare for a jury sentencing. It is the State's position that the record demonstrates clearly Ware's competency, despite the strategic dispute with his attorneys, and that there was no need for the court to take any further action with respect to Ware's competency to elect the mode of sentencing.

---

ordinary meaning, is equated with immaturity. It is for you to determine if the defendant, who was (age) at the time of the crime, was of youthful age. In making that determination, you should consider such factors as the defendant's chronological age, mental development, learning, and life experience, as they bear on the defendant's degree of maturity.

*See* MPJI–CR 7:00 (1986, 1999 Supp.).

We strongly recommend that trial judges' instructions on youthful age include the more expanded explanation of youthful age.

On the day the sentencing proceeding began, Appellant was questioned by his counsel regarding his election to be sentenced by the jury:

[DEF. ATT'Y:] Mr. Ware, we have had an opportunity to discuss this matter at length on many occasions. We are now at the stage of these proceedings where the sentence or—there is going to be—a sentencing determination is going to have to be made. You have been found guilty of two counts of first degree premeditated murder, and as a result the State is seeking to have a death sentence imposed.

Basically whatever sentencing authority—whatever authority sentences you, will have three options available to them. They will have the option of life, life without the possibility of parole and death.

You have to make the decision as to which authority you want to sentence you. In other words, you can be sentenced by the same jury that has found you guilty at the guilt/innocence stage, or you can elect to waive your right to a jury sentencing and present your mitigation and agree to have Judge Thieme basically be the sentencing authority. Do you understand that?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] Now, we have had an opportunity to discuss this issue of how to proceed on sentencing on many occasions. Is that correct?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] We have discussed it—well, I have been in the case since last October, October of last year. But before I got in the case, you also discussed the issue of how you wanted to proceed at the time of sentencing with Mr. Wachs, who was your prior attorney, and Mr. Gunning. Is that correct?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] And during all of those previous discussions, the discussions you had with Mr. Wachs and the discussions you had with Mr. Gunning and the discussions

that you had with me, up until yesterday you had indicated that you believed that it would be in your best interest to proceed by way of court sentencing. Is that correct?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] And we discussed the pros and cons and the advantages and disadvantages to proceeding by way of a jury sentencing versus a Court sentencing. Is that correct?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] Now, yesterday you—well, before I get to yesterday, we had been preparing on the basis of your representations and our conversations. We have been preparing—if we got to this phase, we had been preparing to proceed by way of a Court sentencing up until yesterday. Is that correct?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] And that was based on our discussions and your indications to us as to how you wanted to proceed. Is that correct?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] Yesterday, you expressed your decision or your feeling that you wanted to proceed by way of a jury sentencing. Is that correct?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] And we discussed that for a long time yesterday, didn't we?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] Over two hours?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] And we strongly urged you to waive your right to jury sentencing and proceed by way of a Court sentencing. Isn't that correct?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] And in spite of our lengthy conversations and our virtual prayers to you to proceed by way of a Court sentencing, you indicated that you wanted to proceed by way of a jury sentencing. Is that correct?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] Once again, just to make it clear, and that was against our advice?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] Okay. The decision is yours. We can't tell you what to do. The final decision is yours. So, we can't sit here and tell you you have to have Court or you have to have jury sentencing.

But I have to let you know, after consulting with colleagues in the office, it is our belief that we should, under these circumstances, really disregard your election and decide to proceed by way of a Court sentencing anyway. Do you understand that?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] The final decision is going to be up to Judge Thieme as to who wins out in this, because basically we are at the point now where we are not on the same page. Up until yesterday we were on the same page, that we were going to do the court sentencing. Correct?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] Okay. I am going to have to ask you to keep your voice up so your answers can be heard. Okay?

And yesterday, we realized that our paths were no longer—that our paths had separated. Is that correct?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] So now, we are in the position of you stand before Judge Thieme and you say, Judge, I want a jury sentencing. Is that what you are saying?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] Against the pleas of my counsel?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] We are standing in front of Judge Thieme saying, Judge he doesn't know what he is doing. He can't be in his right mind. If he wants a jury sentencing, disregard what he wants to do, accept our election to allow this matter to be heard before the Court and allow us to

waive the jury sentencing portion. Do you understand that we are differing on that?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] Do you understand that His Honor is going to make the final decision about that, in terms of who wins in this battle?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] Okay. Once again, Mr. Ware, we have gone over your age and the fact that you have never been in a mental institution or the care of a psychiatrist. We did that yesterday with your election not to testify.

Are you under the influence of any drugs, alcohol or any other substance that would prevent you from understanding what is going on here today?

DEFENDANT: No sir.

[DEF. ATT'Y:] Has anyone forced you to do this? Well, strike that. This is where we are, Your Honor. An impasse.

The judge then addressed Appellant, and the following colloquy ensued:

THE COURT: Mr. Ware, let me tell you what the law of this State is, and I am quoting from *Gilliam v. State*, 331 Md. 651 [629 A.2d 685], and I am quoting directly. "Election of a court or jury trial and/or sentencing is a decision for the defendant."

Regardless of what your attorneys think they are going to do, the decision is yours, and I will abide by your decision. What do you want?

DEFENDANT: Jury.

THE COURT: That ends it.

[DEF. ATT'Y:] Yes.

When the attorney for the State began to take issue with the suggestion that Ware must not be in his right mind, defense counsel retracted this assertion:

[STATE'S ATT'Y:] Your Honor, if I may? If you could, just based on some of the things that [defense counsel] said

regarding it is their position that Mr. Ware must not be in his right mind, that he doesn't understand what's going on, if the Court would inquire as to any condition he may have, which would indicate that he is not in his right mind or—

THE COURT: Did you understand what was happening this morning, Mr. Ware?

DEFENDANT: Yes, sir.

[DEF. ATT'Y:] And also, I understand [State's Attorney's] concern. I took some license with the language that I was using. I don't mean to imply any—

THE COURT: I understood from the standpoint of trial strategy.

[DEF. ATT'Y:] Exactly. *I am not implying that—*

THE COURT: But let's make—

[DEF. ATT'Y:] *—he is not capable or competent to make the decision.*

The court made further inquiry, as follows:

THE COURT: Do you understand what was said this morning?

DEFENDANT: Yes, sir.

THE COURT: Do you have any questions about what your counsel has asked you?

DEFENDANT: No, sir.

THE COURT: You obviously had a jury the first time this case went to trial. So I assume you know about your rights for a jury or non-jury regarding the sentencing phase.

DEFENDANT: Yes, sir

THE COURT: And did Judge Sweeney go through it before you in Howard County in the prior trial?

DEFENDANT: Yes, sir.

THE COURT: All right. Is there anything that you want to ask me about what counsel has asked you?

DEFENDANT: No, sir.

THE COURT: Do you want to consider it further?

DEFENDANT: No, sir.

THE COURT: Does the State have any further inquiries you want me to make?

[STATE'S ATT'Y:] Your Honor, just for the record. I know it was on there yesterday.

THE COURT: Go ahead.

[STATE'S ATT'Y:] Has Mr. Ware—have you now or have you ever been a patient in a mental institution or under the care of a psychologist or a psychiatrist?

DEFENDANT: Never.

Subsequently, Appellant's counsel requested a postponement of the sentencing proceeding until mid-September, partly on the basis of Appellant's last-minute decision to be sentenced by the jury. The court denied the request for postponement.

Criminal defendants have a Fourteenth Amendment due process right not to be tried when they are incompetent. *See Thanos v. State*, 330 Md. 77, 84, 622 A.2d 727, 730 (1993). In *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), Chief Justice Burger, writing for the Court, explained:

It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial.

Implementing the Supreme Court standard, Maryland Code (1982, 1994 Repl.Vol., 1999 Supp.) § 12–103(a) of the Health–General Article specifies:

If, before or during a trial, the defendant in a criminal case appears to the court to be incompetent to stand trial or the defendant alleges incompetence to stand trial, the court shall determine, on evidence presented on the record, whether the defendant is incompetent to stand trial.

The Code defines "incompetent to stand trial" as "not able: (1) [t]o understand the nature or object of the proceeding; or (2) [t]o assist in one's defense." *Id.*, § 12–101(e). As we noted in

*Thanos,* "[a] defendant must, in other words, have 'present ability to consult with his lawyer with a reasonable degree of rational understanding—and . . . a rational as well as factual understanding of the proceedings against him.'" *Thanos,* 330 Md. at 85, 622 A.2d at 730 (quoting *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)).

 A defendant is presumed to be competent to stand trial. *See e.g. Colbert v. State,* 18 Md.App. 632, 641, 308 A.2d 726, 731 (1973). However, § 12–103(a) of the Health–General Article places a duty on the trial court if, during trial, a defendant appears to the court to be incompetent or the defendant alleges incompetency to determine whether the defendant is in fact competent to stand trial. The court's duty is triggered in one of three ways: (1) upon motion of the accused; (2) upon motion of the defense counsel; or (3) upon a *sua sponte* determination by the court that the defendant may not be competent to stand trial. *See Johnson v. State,* 67 Md.App. 347, 358–59, 507 A.2d 1134, 1140 (1986). In addition, we have held that "a finding of competency to stand trial does not automatically result in a conclusion that an accused is also competent to waive substantial rights, such as the right to plead not guilty, the right to a jury trial, and the right to assistance of counsel." *Mann v. State's Attorney for Montgomery County,* 298 Md. 160, 169, 468 A.2d 124, 129 (1983).

 Under § 413(b), sentencing shall be by jury and, if waived, before the court alone.[14] *See Bruce v. State,* 328 Md.

---

**14.** Section 413(b), governing the determination of the sentencing authority in a death penalty sentencing proceeding, provides as follows:

This proceeding shall be conducted:
 (1) Before the jury that determined the defendant's guilt; or
 (2) Before a jury impaneled for the purpose of the proceeding if:
 (i) The defendant was convicted upon a plea of guilty;
 (ii) The defendant was convicted after a trial before the court sitting without a jury;
 (iii) The jury that determined the defendant's guilt has been discharged by the court for good cause; or
 (iv) Review of the original sentence of death by a court of competent jurisdiction has resulted in a remand for resentencing; or

594, 602, 616 A.2d 392, 396 (1992). Whether a defendant is to be sentenced by the court or the jury is a decision for the defendant. *See* Maryland Rule 4–246; *Gilliam v. State,* 331 Md. 651, 670, 629 A.2d 685, 694 (1993); *Bruce,* 328 Md. at 602–07, 616 A.2d at 396–98.

▮▮▮▮▮▮ Ware argues that the absence of a record demonstrating a competent basis for his eleventh hour decision to elect a jury sentencing despite his attorneys advice to the contrary obligated the court to conduct, *sua sponte,* a competency examination. Ware's entire argument appears to be that the court must inquire, *sua sponte,* into the competency of a defendant, based solely on a defendant's election to be sentenced by a jury, when the choice is contrary to the recommendation of his counsel. His argument is meritless. Where there is no independent reason to question or doubt defendant's competency, no hearing or inquiry is required. *Cf. State v. Cowans,* 87 Ohio St.3d 68, 717 N.E.2d 298, 311 (1999).

We had occasion to discuss the trial court's obligation to inquire, *sua sponte,* into a defendant's competency in *Thanos.* Thanos was convicted of first-degree murder and sentenced to death. Over the objection of his counsel, he waived a jury on the guilt/innocence stage and the sentencing. *See Thanos,* 330 Md. at 84, 622 A.2d at 730. On appeal, as to his competency to waive a jury, he argued that he was not competent to make the decision to waive a jury trial and that the court should have deferred to his attorney's preference for a jury trial. His back up argument was that, even if the choice to waive a jury trial and jury sentencing were his to make, he did not do so knowingly, voluntarily, or intelligently. Thanos also argued that the "trial court failed to recognize its *sua sponte* obligation to inquire into his competency given his strange behavior at trial and sentencing." *Id.* at 85, 622 A.2d at 730. We found no error on the trial court's failure to conduct a compe-

---

(3) Before the court alone, if a jury sentencing proceeding is waived by the defendant.

tency hearing. *Id.* at 87, 622 A.2d at 731. The record disclosed that Thanos had the present ability to consult with his counsel with a reasonable degree of rational understanding as well as a rational and factual understanding of the proceedings against him. We also rejected his claims related to jury trial and sentencing waiver, stating:

> We find no merit in these contentions. Thanos has made no claim that the trial court erred in explaining his right to be tried and sentenced by a jury. In both cases, the trial judge patiently spelled out to Thanos the alternatives and consequences involved in proceeding before a judge rather than a jury. As we noted in *Treece,* a decision need not be wise to be legally "intelligent." All that matters is that Thanos was "made aware of available alternatives and of the advantages and disadvantages of one choice as compared to another." Because Thanos was so informed, his arguments that he did not knowingly waive trial and sentencing by jury, and that the court should have deferred to his counsel's position on the issue of jury trial waiver, are merely extensions of his claims that he was incompetent to stand trial, which is devoid of merit for the reasons discussed in part II, *supra.*

*Id.* at 94, 622 A.2d at 735 (citations omitted).

As in *Thanos,* Ware's competency to be sentenced by a jury was never raised before the trial court or even during the trial. It is noteworthy that, when questioned by the court, defense counsel explicitly stated that he was *not* suggesting that Appellant was incompetent. The record shows that defense counsel and the trial judge engaged Appellant in a colloquy concerning his election of a jury sentencing, the nature of the decision, Appellant's mental treatment/medical history, his knowledge of the procedure based on *Ware I,* and the absence of any influence of alcohol or drugs. Appellant's mere preference for a jury sentencing is hardly an indication that he was incompetent.

We hold that the trial court did not err in failing to conduct, *sua sponte,* a competency examination. There is nothing in

the record to indicate that Appellant lacked the present ability to consult with his attorneys with a reasonable degree of rational understanding or factual understanding of the proceedings. Appellant's decision to proceed with jury sentencing in light of defense counsel's recommendation to the contrary is insufficient in and of itself to trigger a competency examination.

Appellant next argues that, when the trial court learned of Ware's sudden shift in sentencing strategy and defense counsel's self-professed unpreparedness, the trial court was required to conduct a hearing to determine whether counsel could effectively represent Appellant during the sentencing phase and whether this so-called conflict necessitated the withdrawal of counsel. Appellant concludes that it was highly doubtful that Appellant could receive effective assistance of counsel during the sentencing phase. Again, we point out that at no time before the trial court did defense counsel ask to withdraw from representing Appellant.

If Appellant is raising an ineffective assistance of counsel claim, it is more properly raised in post-conviction proceedings. See Perry v. State, 344 Md. 204, 227–28, 686 A.2d 274, 285 (1996). Regarding Appellant's claim that the trial court should have inquired into Ware's relationship with his counsel, based on the record before us, we believe that it would have been highly inappropriate for the trial court to have interfered with that relationship at that stage of the proceedings.

Appellant argues that the trial judge's refusal to postpone the sentencing to allow counsel additional time to prepare was an abuse of discretion requiring reversal. It is settled that the decision whether to grant a postponement is within the sound discretion of the trial judge. See, e.g., Wilson v. State, 345 Md. 437, 451, 693 A.2d 344, 351 (1997); Evans v. State, 304 Md. 487, 514, 499 A.2d 1261, 1275 (1985). Defense counsel had at least eighteen months to prepare for sentencing; he told the court as much. Appellant never specified, at trial or on appeal, how his sentencing case might

have been presented differently if he had had more time. We find no abuse of discretion in denying the postponement.

*D. Denial of Motion to Preclude Death Penalty Proceeding*

Appellant argues that the trial court erred in denying his motion to preclude the State from seeking the death penalty based on alleged prosecutorial misconduct that resulted in the reversal of his conviction in *Ware I.*[15] Appellant filed two pretrial motions addressed to the capital sentencing proceeding: a motion to dismiss the death notice due to prosecutorial misconduct and a motion to bar subsequent prosecution of the case. Both motions were based entirely on the alleged misconduct of the prosecutor before and during Ware's first trial as it relates to Edward Anderson and any State's promise of leniency for his testimony. The trial judge denied the motions, ruling as follows:

> As to the motions, the three motions that [defense counsel] argued, the first was the motion to dismiss the death notice due to prosecutorial misconduct, the court denies. As to the motion to bar subsequent prosecution because of prosecutorial misconduct, the court denies. And as to the motion to preclude the testimony of prospective witness Anderson, the court denies that.[16] All of those motions were predicated on prosecutorial misconduct, and if there is to be any sanctions along the lines that the defense is urging, it will have to come from the Appellate Courts, not from this court. So for those reasons, the court denies these motions.

Appellant's argument is two-fold before this Court. He argues that fundamental fairness requires that the State be precluded from again seeking the death penalty. He also

---

**15.** In *Ware I*, we reversed Ware's conviction and sentence because the prosecution failed to disclose information, as required by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that the State's witness Edward Anderson had a motion pending at the time of trial for reconsideration of his life sentence in an unrelated case. *See Ware I*, 348 Md. at 54–55, 702 A.2d at 716.

**16.** Appellant has not appealed the trial court's denial of his motion to exclude Anderson as a witness.

argues that Maryland's common law of double jeopardy bars the State from seeking the death penalty. The essence of his argument is that a genuine sanction for serious prosecutorial overreaching is necessary, beyond that of a reversal of the conviction and new trial, to create strong incentive for prosecutors to "play by the rules." [17] Both arguments fail.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution [18] protects against successive prosecution as well as cumulative punishment and is applicable to the States through the Fourteenth Amendment. *See State v. Griffiths*, 338 Md. 485, 489, 659 A.2d 876, 878 (1995); *Brown v. Ohio*, 432 U.S. 161, 166, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); *Benton v. Maryland*, 395 U.S. 784, 793, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Even though the Maryland Constitution has no express double jeopardy provision, there is protection against it under Maryland common law. *See Gianiny v. State*, 320 Md. 337, 347, 577 A.2d 795, 799 (1990); *Pugh v. State*, 271 Md. 701, 705, 319 A.2d 542, 544 (1974); *State v. Barger*, 242 Md. 616, 619, 220 A.2d 304, 306 (1966).

The aspect of double jeopardy law that we are concerned with in this case is retrial following reversal upon a defendant's successful appeal.[19] A retrial following a reversal has always been permitted, *see e.g., Lockhart v. Nelson*, 488 U.S. 33, 38, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988); *Ball v. United States*, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300

---

**17.** Appellant has abandoned his trial argument that the court should bar the entire prosecution, addressing his argument in this Court solely to the imposition of the death penalty.

**18.** The Double Jeopardy Clause provides: "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb."

**19.** In this complex area of jurisprudence, the Supreme Court has said:
[T]he decisional law in the [double jeopardy] area is a veritable Sargasso Sea which could not fail to challenge the most intrepid judicial navigator.
*Albernaz v. United States*, 450 U.S. 333, 343, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981).

(1896), with the exception of a reversal based upon the insufficiency of the evidence. *See United States v. DiFrancesco,* 449 U.S. 117, 130, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980); *Burks v. United States,* 437 U.S. 1, 11, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Mackall v. State,* 283 Md. 100, 113, 387 A.2d 762, 769 (1978); *Fields v. State,* 96 Md.App. 722, 744, 626 A.2d 1037, 1048 (1993).

 Appellant looks to the mistrial/retrial species of double jeopardy as support for his argument that retrial should be barred as a sanction for prosecutorial misconduct. He seeks not only an application of the principles of *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), but an extension of the principles articulated in that case. *Kennedy* dealt only with the species of federal double jeopardy where a mistrial is declared at the request of the defendant. In the mistrial/retrial situation, the general rule is that the protection against double jeopardy is waived when a defense-requested mistrial is granted, *see United States v. Scott,* 437 U.S. 82, 93, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978), and *Cornish v. State,* 272 Md. 312, 318, 322 A.2d 880, 884 (1974), unless, under the very narrow exception set out in *Kennedy,* the mistrial motion was precipitated by judicial overreaching or deliberate prosecutorial misconduct intended to provoke or goad the defendant into making the motion. In *Kennedy,* the Supreme Court held that

the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.

456 U.S. at 679, 102 S.Ct. 2083.

The Court was careful to point out that retrial following reversal on appeal—the situation presented in the instant case—is governed by a different principle. "This Court has consistently held that the Double Jeopardy Clause imposes no limitation upon the power of the government to retry a defendant who has succeeded in persuading a court to set his

conviction aside, unless the conviction has been reversed because of the insufficiency of the evidence." *Id.* at 676 n. 6, 102 S.Ct. 2083. *Kennedy* provides no support for the proposition that barring capital re-prosecution is an appropriate response to the State's failure to disclose exculpatory evidence in violation of its obligation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant has not identified any case where the United States Supreme Court has extended *Kennedy* to situations where convictions have been reversed on appeal due to prosecutorial misconduct and the retrial has been barred by double jeopardy. The short answer is that the standard announced in *Kennedy* has nothing to do with this case.

Appellant concedes that his capital re-sentencing proceeding was not barred by the Double Jeopardy clause of the United States Constitution. No motion for mistrial based on prosecutorial misconduct was ever made, nor was a mistrial declared. Instead, Appellant was convicted and sentenced to death, followed by a reversal on appeal. He is asking this Court "to mold Maryland's law of double jeopardy under common law principles [to hold that] . . . where as here the State violates the rules in a manner potentially leading to the execution of a human being, the appropriate sanction is to preclude the possibility that the accused will be put to death as a result of subsequent proceedings in the same case." Appellant's brief at 65. Thus, we must decide whether Maryland common law double jeopardy principles bar a capital re-sentencing proceeding when the defendant never asked for a mistrial on the ground of prosecutorial misconduct.

 Appellant urges this Court to adopt, as a matter of common law, a stricter approach to double jeopardy than that taken in *Kennedy*, in order to sanction prosecutorial misconduct, at least in death penalty cases. To punish a prosecutor for creating grounds for reversal by violating the precepts of *Brady*, however, is not among the purposes of double jeopardy protection. "[T]o require a criminal defendant to stand trial again after he has successfully invoked a statutory right of

appeal to upset his first conviction is not an act of governmental oppression of the sort against which the Double Jeopardy Clause was intended to protect." *United States v. Scott,* 437 U.S. 82, 91, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978). As we stated in *Tichnell v. State,* 297 Md. 432, 440–41, 468 A.2d 1, 5 (1983):

> [Judicial misconduct] is significant for purposes of double jeopardy when a mistrial is declared at the behest of the defendant. . . . When a defendant's trial is completed and his conviction later reversed on appeal, different rules pertain. With some exceptions, the defendant who successfully challenges his conviction may be retried, under the rationale that "the defendant wiped the slate clean and the parties may start anew." *Jones v. State,* 288 Md. 618, 625, 420 A.2d 1241, 1244 (1980), *cert. denied,* 449 U.S. 1115, 101 S.Ct. 928, 66 L.Ed.2d 845 (1981).

*Cf. Booth v. State,* 301 Md. 1, 481 A.2d 505 (1984) (holding that pretrial prosecutorial misconduct does not result in double jeopardy bar unless intentionally calculated to result in mistrial); *Bell v. State,* 286 Md. 193, 205–06, 406 A.2d 909, 915–16 (1979) (holding that, even when prosecutorial misconduct results in mistrial, double jeopardy does not bar retrial unless misconduct committed intentionally to force mistrial).

Although we do not condone the actions of the prosecutor in *Ware I,* we believe that Appellant was accorded the relief to which he was entitled—reversal of his conviction on appeal. Under the circumstances presented herein, Maryland common law principles of double jeopardy do not bar the State from seeking the death penalty at re-sentencing. We find no error in the trial court's denial of the motion to preclude re-prosecution of the death penalty.

▆▆ A *Brady* violation has been treated consistently as a "violation of an accused's due process right to a fair trial where the failure undermined confidence in the trial's outcome." *Ex Parte Mitchell,* 977 S.W.2d 575, 578 (Tex.Ct.Crim. App.1997). The remedy for a *Brady*/due process violation is the reversal of the judgment of conviction and remand of the case for further proceedings, including retrial. *See Kyles v.*

*Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Brady,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. We see no sound reason to impart a different standard.

Other state courts similarly have declined to extend state law so as to bar, on double jeopardy grounds, retrials following reversals based on prosecutorial misconduct. *See e.g. Fugitt v. State,* 253 Ga. 311, 319 S.E.2d 829, 833–34 (1984); *State v. Chase,* 335 N.W.2d 630, 632 (Iowa 1983); *State v. Swartz,* 541 N.W.2d 533, 540–41 (Iowa Ct.App.1995); *State v. Sage,* 31 Ohio St.3d 173, 510 N.E.2d 343, 353–54 (1987); *Ex parte Mitchell,* 977 S.W.2d at 580–81. The same is true for some federal courts. *See e.g. Beringer v. Sheahan,* 934 F.2d 110, 114 (7th Cir.1991) (holding that a "defendant who did not move for a mistrial on the basis of intentional prosecutorial misconduct cannot invoke the double jeopardy clause to bar the state from retrying him after his conviction is reversed on that ground"). *But see United States v. Wallach,* 979 F.2d 912, 916 (2d Cir.1992) (holding that double jeopardy bars retrial after reversal of conviction where there has been intentional prosecutorial misconduct "undertaken, not simply to prevent an acquittal, but to prevent an acquittal that the prosecutor believed at the time was likely to occur in the absence of his misconduct").[20]

### E. The Constitutionality of Maryland's Death Penalty Statute

Appellant argues that Maryland's death penalty statute is unconstitutional. Specifically, he argues that the statute is unconstitutional because the statute (a) requires the defendant to prove mitigating circumstances by a preponderance of the evidence; (b) requires the defendant to establish that non-enumerated mitigating circumstances are mitigating circumstances; and (c) requires a sentence of death where aggravating circumstances outweigh mitigating circumstances by only

---

**20.** Ware's claim would fail even under the *Wallach* exception.

a preponderance of the evidence. We have addressed these claims over the years and have rejected them. *See Conyers v. State* (*Conyers II* ), 354 Md. 132, 198–99, 729 A.2d 910, 945 (1999); *Wiggins v. State*, 324 Md. 551, 582–83, 597 A.2d 1359, 1374 (1991) (finding no merit in challenges to defendant's burden regarding statutorily recognized and other mitigating factors or to burden of proof). Appellant presents no arguments that persuade us to reconsider those earlier decisions.

### F. Determinations Required by Section 414(e)

Although Appellant does not address. the issue, we are required by Article 27, § 414(e) to make certain determinations regardless of whether any error is assigned. *See Thanos v. State*, 330 Md. 77, 97, 622 A.2d 727, 737 (1993). We make the following determinations:

(1) The sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) The evidence supports the jury's findings of a statutory aggravating circumstance under § 413(d); and

(3) The evidence supports the jury's findings that the aggravating circumstances outweigh the mitigating circumstances.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED.**

BELL, C.J., dissents.

BELL, Chief Judge, dissenting.

In this case, acknowledging the continuing validity of *Bohnert v. State*, 312 Md. 266, 539 A.2d 657 (1988) [1] and, despite

---

1. *Bohnert v. State*, 312 Md. 266, 278, 539 A.2d 657, 663 (1988) makes clear "that a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth. Testimony from a witness relating to the credibility of another witness is to be rejected as a matter of law." We also said in *Bohnert*, "[i]t is ... error for the court to permit to go to the jury a statement, belief, or opinion of another person to the effect that a witness is telling the truth or lying." *Id.* at 277, 539 A.2d at 662.

declaring it distinguishable [2] in its application to the facts sub judice, the majority holds that the testimony of Edward Anderson, a critical witness for the State, was inadmissible. Anderson was permitted to testify in front of the jury, the trier of fact, that certain law enforcement officers, *i.e.*, a prosecutor with the Anne Arundel County State's Attorney's office and a police detective, testified at his sentence reduction hearing that "[he] was being truthful in bringing them this information [about] the petitioner's involvement in the murders with which he was charged." The petitioner challenged Anderson's credibility by attempting to prove that the motivation for his testimony was leniency. Thus, the petitioner's cross examination of Anderson concerned Anderson filing a motion for modification of sentence prior to the petitioner's first trial, his bringing to the attention of the sentencing judge that he was a State's witness in the petitioner's trial, and the fact that a prosecutor and a police detective involved in the investigation of the murder with which the petitioner was charged were called to testify at Anderson's modification hearing. Consequently, Anderson's testimony in this regard was designed to, and did, bolster his credibility for the jury.

Having determined that Anderson's testimony concerning the prosecutor and the police detective was inadmissible and, thus, that its admission was error, the majority then holds that the error was harmless. It reasons that the distinction it has

---

**2.** In *Bohnert*, a social worker, testifying as an expert, was allowed to say, based only on the child's statements, that a child was the victim of sexual abuse. We held that testimony invaded the province of the jury because it was in effect a declaration that the child was telling the truth and that the defendant in the case was lying. *See* 312 Md. at 276, 278–79, 539 A.2d at 662–63. The majority distinguishes *Bohnert* and this case, as follows:

"In *Bohnert*, the State called a witness before the jury to bolster the credibility of another witness. In this case, we merely have the self-serving statement of the witness saying that others thought he was being truthful. Here we have Anderson basically saying: I am telling you the truth. I am telling you also that two others said I am telling you the truth."

360 Md. 650, 679, 759 A.2d 764, 779 (2000).

drawn reduces the prejudicial impact of the evidence. 360 Md. at 679, 759 A.2d at 779. Then it asserts:

"Anderson made a self-serving statement to the effect that certain persons not present once affirmed, on an unknown basis, his truthfulness in making the statements he again made at trial. Such a statement, by a witness whose credibility is in question, is far less weighty than the expert in *Bohnert,* and its effect on the jury was likely to be insignificant. Moreover, it is implicit that the police believed Anderson or they would not have gone to bat for him at the hearing on his motion to reduce his sentence."

Id. at 679, 759 A.2d at 779. I do not agree and, so, dissent.

Once again, I find myself engaged in what sometimes seems like a never-ending battle to protect the integrity and vitality of the harmless error rule. See my dissenting opinions in *Jensen v. State,* 355 Md. 692, 718, 736 A.2d 307, 320 (Md.1999); *Evans v. State,* 333 Md. 660, 711, 637 A.2d 117, 136 (1994); *Bruno v. State,* 332 Md. 673, 696, 632 A.2d 1192, 1204 (1993); *Rubin v. State,* 325 Md. 552, 591, 602 A.2d 677, 696 (1992). This is so despite the clarity of the statement of the rule in *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976), and the frequency with which it has been repeated with approval and thus reaffirmed, since. But as this case and those that precede it, to some of which I have just referred, demonstrate, to state the rule accurately is not necessarily to apply it appropriately.

The test of harmless error focuses on the effect of erroneously admitted, or excluded, evidence on the verdict rendered by the jury. As enunciated in *Dorsey,* the rule is:

"When an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence com-

plained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict." 276 Md. at 659, 350 A.2d at 678 (footnote omitted). Once it has been determined that error was committed, reversal is required unless the error did not influence the verdict; the error is harmless only if it did not play any role in the jury's verdict. The reviewing court must exclude that possibility "beyond a reasonable doubt."

Moreover, an appellate court reviewing a trial court verdict must apply the harmless error rule consistently with its role; it should not take on the role of the trier of fact and substitute its judgment for that of the jury or the trial court whose verdict is under review. That would be to usurp the function of the trier of fact and that is not allowed.[3] *See, e.g., Daniels v. State,* 24 Md.App. 1, 7, 329 A.2d 712, 716 (1974) ("We may not usurp the function of the jury by holding that the eyewitnesses should be believed over the alibi evidence."). *See also Shelton v. State,* 198 Md. 405, 412, 84 A.2d 76, 80 (1951) ("This Court will not inquire into or measure the weight of the evidence, and will not reverse the judgment if there is any proper evidence before the jury on which to sustain a conviction."); *Alexander v. Tingle,* 181 Md. 464, 467, 30 A.2d 737, 738 (1943) ("The Court had not the authority to direct the jury that the evidence established a certain fact even though the evidence was uncontradicted and highly persuasive. The Court could not thus usurp the function of the jury to weigh the credibility of the evidence."); *Collins v. State,* 14 Md.App.

---

**3.** There was a time when the Court of Appeals refused to pass upon the question of the sufficiency of evidence to establish the crime with which the accused is charged for the reason that such action would usurp the constitutional function of the jury. *See, e.g., Berger v. State,* 179 Md. 410, 416–17, 20 A.2d 146, 149 (1941). At that time, it was well settled that, because, "[u]nder the Maryland Constitution, art. 15, sec. 5, the jury are the judges of both the law and the facts in the trial of all criminal cases in the State," "the question of the legal sufficiency of evidence in a criminal case to sustain a conviction is exclusively for the jury to determine." *Id.* at 416, 20 A.2d at 149 *(citing Deibert v. State,* 150 Md. 687, 695, 133 A. 847, 851 (1926)); *Willie v. State,* 153 Md. 613, 617, 139 A. 289, 291 (1927).

674, 679, 288 A.2d 221, 224 (1972) ("The weight of the evidence and the credibility of witnesses are matters within the realm of the jury."); *Wilkins v. State*, 11 Md.App. 113, 127, 273 A.2d 236, 243 (1971) ("The weight of evidence and the credibility of the witnesses [are] for the jury."). In this regard, what I said in dissent in *Rubin* has relevance here:

"No matter how strong a case for conviction the State may present, even when the defense presents no evidence, the court may not direct a verdict for the State. See Maryland Rule 4–324, which, while providing that a defendant may move for judgment of acquittal, Rule 4–324(a), and the court may direct the entry of judgment in his or her favor if there is insufficient evidence, as a matter of law, Rule 4–324(b), makes no provision for the making of a motion for judgment by the State. Compare Maryland Rule 2–519, the civil counterpart. *Lyles v. State {State v. Lyles}*, 308 Md. 129, 135, 517 A.2d 761, 764 (1986). This is so because it is the trier of fact, whether the court or a jury, that must determine if the State has met its burden of proof. To make that determination, the trier of fact is required to find the facts and when, as is usually the case, there are credibility issues, to resolve them. That, in turn, involves weighing the evidence. Appellate courts do not find facts or weigh evidence, 'what evidence to believe, what weight to be given it, and what facts flow from that evidence are for the jury ... to determine.' *Dykes v. State*, 319 Md. 206, 224, 571 A.2d 1251, 1260–[6]1 (1990). *See Gore v. State*, 309 Md. 203, 214, 522 A.2d 1338, 1341 (1987); *Wilson v. State*, 261 Md. 551, 566, 276 A.2d 214, 221 (1971); *Jacobs v. State*, 238 Md. 648, 650, 210 A.2d 722, 723–[2]4 (1965). Even when an appellate court assesses the sufficiency of the evidence, it does not weigh it, *see Clemson v. Butler Aviation–Friendship*, 266 Md. 666, 671, 296 A.2d 419, 422 (1972); *Gray v. Director, Patuxent Institution*, 245 Md. 80, 84, 224 A.2d 879, 881 (1966), it only determines if any evidence exists, on the basis of which a rational trier of fact could find the elements of the crime beyond a reasonable doubt. *See*

*Jackson v. Virginia*,[4] 443 U.S. 307, 319, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560, 573 (1979); *Bloodsworth v. State*, 307 Md. 164, 167, 512 A.2d 1056, 1057 (1986). There is no reason that a harmless error analysis should permit it to do more." 325 Md. at 596–97, 602 A.2d at 698–99.

Citing *Dorsey*, the majority declares itself "satisfied that there is no reasonable possibility that the evidence complained of ... may have contributed to the rendition of the guilty verdict." 276 Md. at 659, 350 A.2d at 678. Although mouthing the proper test, its rationale for so concluding belies its proper application. To the majority, it is significant and, indeed obvious, that Anderson's testimony, because Anderson's credibility is in issue, was "far less weighty" when compared with the expert testimony in *Bohnert* and, more important, "its effect on the jury was likely to be insignificant." In so concluding, rather than determining whether the evidence likely, or could have, influenced the jury verdict, the majority places itself in the shoes of the jury and, in that posture, determines the weight that it would give the evidence, attributing that weight to the jury that decided the case. Thus, rather than apply the *Dorsey* test, it applies the test as explained in *Ross v. State*, 276 Md. 664, 674, 350 A.2d 680, 686–87 (1976). In so doing, the majority expands the harmless error rule in a manner that is both unwarranted and unsupportable.

As I explained in *Rubin*,

"The essence of this test is the determination whether the cumulative effect of the properly admitted evidence so out-

---

4. In *Jackson*, the Supreme Court states:

"The sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt (citing *Woodby v. INS*, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966)). Instead, the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt (citing *Johnson v. Louisiana*, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972))."

weighs the prejudicial nature of the evidence erroneously admitted that there is no reasonable possibility that the decision of the finder of fact would have been different had the tainted evidence been excluded (quoting *Ross,* 276 Md. at 674, 350 A.2d at 686–87).

"Thus excising the evidence admitted in error, and focusing on what remains, it concludes that a reasonable doubt simply could not have been generated from that evidence. Under that formulation, the test for harmless error is: whether, excluding the offending evidence, that which remains is sufficient to sustain the conviction and/or is, in fact, such that the case for conviction is "overwhelming." It requires, in addition to the threshold determination of sufficiency, that an appellant court weigh the evidence. So, the majority reasons, where the evidence is sufficient to convict and it is also strong enough to meet its definition of "overwhelming," only one verdict, guilty, is possible, as a matter of law; hence, that evidence cannot generate a reasonable doubt.

"Although the *Ross* formulation of the test has been stated in subsequent cases, *see Trusty v. State,* 308 Md. 658, 668–69, 521 A.2d 749, 754 (1987), and even applied, *see Mills v. State,* 310 Md. 33, 48–49, 527 A.2d 3, 10 (1987) (dicta), I have found no case which has provided a reasoned justification for it. It is significant, I think, that the error in *Ross* was held not to be harmless and that a factor influencing that holding was that the case was tried by a jury. 276 Md. at 674, 350 A.2d at 686–87. *See also State v. Fuller,* 308 Md. 547, 554, 520 A.2d 1315, 1318 (1987) (where trier of fact considered erroneously submitted evidence, case remanded to determine if, without that evidence trier of fact would reach same conclusion). In any event, that approach, in my opinion, is contrary to the role of an appellant court." *Rubin,* 325 Md. at 595–96, 602 A.2d at 698 (Bell, J. dissenting).

Furthermore, applying the harmless error rule as the majority does fails to recognize that the harmless error inquiry is not simply a sufficiency of the evidence inquiry, although when the exclusion of the evidence erroneously admitted results in

an insufficiency of the evidence to convict, the error can never be harmless. To be sure, such an inquiry is required to be made whenever there is a reversal of a conviction on appeal, its function is to determine if a new trial is required, not, except as indicated above, to determine if the error is sufficiently egregious to warrant reversal of the conviction. Moreover, because it is the trier of fact, in this case, the jury, and not an appellate court, that must find the facts and resolve credibility issues,

> "what appears, on the cold record, to be an insurmountable case for the State, when viewed from the jury's perspective, having seen it unfold through live witnesses, in the dramatic atmosphere of the courtroom may be quite a close case or result in a defense verdict. How, or why, a jury may decide to resolve credibility or fact issues in a particular manner is a matter only it knows. One thing is certain, the jury is under no obligation to decide any case consistently with what is, objectively, the strongest case."

*Rubin,* 325 Md. at 593, 602 A.2d at 697 (Bell, J. dissenting). Furthermore, harmless error is the exception to the general rule; it was never intended to be the general rule. In that regard, we have said that the test of harmless error "has been and should be carefully circumscribed." *Younie v. State,* 272 Md. 233, 248, 322 A.2d 211, 219 (1974). And the continuing validity of the majority's harmless error analysis makes what was said in *People v. Jablonski,* 38 Mich.App. 33, 195 N.W.2d 777, 780 (1972):

> "Continued expansion of the harmless error rule will merely encourage prosecutors to get such testimony in, since they know that, they have a strong case, such testimony will not be considered to be reversible error, yet if they have a weak case, they will use such testimony to buttress the case to gain a conviction and then hope that the issue is not raised on appeal,"

more significant and a matter of concern.

Acceptance of the distinction the majority draws between *Bohnert* and the instant case does not warrant a different

result with regard to the harmless error analysis. It may well be that the quality of the testimony of a witness seeking to buttress his own credibility is less than that of a witness deemed to be independent, testifying as an expert. I might also agree that the effect of the latter on the jury might be greater. Neither of these propositions answers the issue in this case, however. There can be a disparity in the quality of the testimony and in impact and yet the testimony of both could, and, I submit, probably would, affect the jury's verdict. Who knows what factors guide the resolution of credibility issues by individual jurors? That respected members of the law enforcement community attest to the witness' truthfulness likely will be viewed by the jury as important and worthy of credit. The source of the testimony, i.e., Anderson, may well be, or, in this case, could have been considered by the jury to be, less important than the fact that was the substance of that testimony, i.e., a prosecutor and a police detective believed what Anderson had to say about the petitioner's involvement in the crime with which the petitioner was charged.